IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | | |
|---|---|---|---|
| WILLIAM A. ROWLAND, | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | Civil Action No. 4:13-cv-00007 | |
| | ) | | |
| CAROLYN W. COLVIN, | ) | | |
| Commissioner of Social Security, | ) | By: | Joel C. Hoppe |
| Defendant. | ) | | United States Magistrate Judge |

**REPORT AND RECOMMENDATION**

Plaintiff William A. Rowland brought this action for review of the Commissioner of

Social Security's (the "Commissioner") decision denying his claim for disability insurance

benefits (DIB) under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–433. Both

parties have moved for summary judgment and filed briefs in support. (ECF Nos. 12, 13, 16, 17).

On appeal, Rowland argues that the Commissioner erred in rejecting the opinions of two treating

physicians. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g), and this case is before the

undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). After carefully

reviewing the record, I find that the ALJ's decision was based on substantial evidence and

respectfully recommend that the Commissioner's decision be affirmed.

I.    Procedural History

Rowland was born in 1965 (Administrative Record, hereinafter "R." 46), and at the time

of the ALJ's decision was considered a "younger individual" under the Act. 20 C.F.R. §

404.1563(b). He has a General Equivalency Diploma ("GED"), and he worked as a finishing

operator in a textile manufacturing plant from 1988 until his alleged onset date. (R. 184.) He

alleges that he has been disabled since July 2, 2010, due to inflammatory arthritis, fibromyalgia,

ischemic heart disease, and obesity. (Pl. Br. 1; R. 21, 183.) After rejecting Rowland's application

1

initially and upon reconsideration, (R. 19, 76, 88.), the Commissioner convened a hearing before an Administrative Law Judge ("ALJ") at Rowland's request on November 21, 2011. (R. 40–75.) Rowland was represented by counsel at the hearing, where he, his brother, and a vocational expert each testified. (R. 40–75.)

On December 15, 2011, the ALJ issued his decision finding Rowland not disabled and denying him benefits. (R. 19–34.) The ALJ found that Rowland had severe impairments of inflammatory arthritis, fibromyalgia, ischemic heart disease, hypothyroidism, tobacco abuse, and obesity, (R. 21–23.), but that none of these impairments met or medically equaled the severity of those listed in 20 C.F.R. part 404, Subpart P, Appendix 1. (R. 23–25.) The ALJ also found that Rowland retained the capacity to perform light work, except that he cannot climb ladders, ropes or scaffolds and can only occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. (R. 25.) In reaching his assessment of Rowland's residual functional capacity ("RFC"), the ALJ afforded "no weight" to the opinions of treating pain management specialist Dr. Lawrence Winikur and treating rheumatologist Dr. Sharukh Shroff. (R. 31.) Although Rowland's impairments prevented him from performing his past work as a finishing operator, the ALJ found, based on a vocational expert's testimony, that Rowland could perform jobs that exist in significant numbers in the national economy. (R. 33.) Thus, the ALJ found that Rowland was not disabled under the Act. (R. 34.)

Rowland timely requested review by the Appeals Council and submitted additional evidence, including a January 27, 2012, letter from Dr. Winikur stating that Rowland was disabled. (R. 15, 998–99.) The Appeals Council "considered" this evidence but found that it "d[id] not provide a basis for changing the Administrative Law Judge's decision," and accordingly denied Rowland's request for review. (R. 1–7.) This appeal followed.

II.   Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final determination that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g) (2012); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence," *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)).  However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law."  *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and if not (5) whether he or she can perform other work. *See* 20 C.F.R. § 404.1520(a)(4); *see also Heckler v. Campbell*, 461 U.S. 458, 460–462 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

### III. Discussion

#### A. *Treating Physician Rule*

Rowland argues on appeal that the ALJ erred in affording no weight to the opinions of Dr. Winikur and Dr. Shroff, in violation of the treating source rule, 20 C.F.R. § 404.1527(c)(2).

##### 1. *Record Relevant to the Treating Physicians' Opinions*

Rowland claims a disability onset date of July 2, 2010, which is also the date he stopped working. (R. 183–84.) On July 8, 2010, Rowland visited Dr. Troy Mohler at Staunton River Family Physicians "complaining of a two week history of progressing achiness, subjective fever, intermittent swelling, and significant fatigue." (R. 795–96.) Rowland had a cough with yellow sputum which had worsened over the past week. (R. 795.) On physical examination, Dr. Mohler reported that Rowland was a "[s]edated appearing gentleman" who was not in acute distress. (R. 795.) Dr. Mohler noted decreased breath sounds bilaterally, but no wheezes or rhonchi. (R. 795.) Chest x-rays demonstrated "some mild haziness in the left lower quadrant, but poor inspiration," and Dr. Mohler was unsure whether "this represents an early pneumonia versus possible scar tissue atelectasis." (R. 795.) Dr. Mohler noted that Rowland's complaints of

"significant fatigue … may be due to his rheumatoid arthritis versus fibromyalgia." (R. 796.) Dr. Mohler also noted again that Rowland appeared "somewhat sedate," and wondered whether Rowland "is getting too much [Lortab] versus worsening rheumatoid arthritis." (R. 796.) Dr. Mohler instructed Rowland to return in 4–5 days for re-evaluation, and to follow up with Dr. Shroff as soon as possible. (R. 795–96.)

Dr. Mohler saw Rowland again on July 19 "for follow up of his diffuse myalgias and arthralgias." (R. 794.) Rowland reported that his coughing had improved, but complained of continued "diffuse body aches, muscle aches in his chest, back, legs, [and] extremities, [and] occasional swelling of his hands." (R. 794.) Dr. Mohler noted that Rowland was "somewhat fatigued and sleepy" and "sedate appearing." (R. 794.) Physical examination revealed clear lungs, and Dr. Mohler concluded that Rowland's chest wall pain was related to his myalgias. (R. 794.) Dr. Mohler noted that he was uncertain if Rowland's myalgias were "rheumatoid arthritis versus fibromyalgia versus something else." (R. 794.)

On July 21, 2010, Rowland visited his rheumatologist, Dr. Shroff. (R. 495–99.) Rowland stated that, since his last visit with Dr. Shroff, "he is feeling like he is having a flare up in his symptoms." (R. 495.) Upon physical exam, Dr. Shroff noted "right shoulder impingement with subacrominal bursitis," "minimally positive bunnell's test in both hands," "evidence of some early osteoarthritis changes … in his fingers with CMC joint squaring," negative Tinel's and Phalen's tests, "multiple sore points all over his body," and "positive impingement test in both shoulders." (R. 498.) In Rowland's legs, Dr. Shroff noted "evidence of crepitus in both knees," full range of motion, positive mid-tarsal squeeze test, and minimal synovitis is his ankles. (R. 498.) Finally, Dr. Shroff noted "strongly positive multiple tender points all over his body." (R. 498.)

By this time, Rowland was already taking a number of drugs for rheumatoid arthritis and fibromyalgia, including prednisone (a corticosteroid), voltaren gel (a non-steroidal anti-inflammatory drug), Lyrica (an anticonvulsant used to treat neuropathic pain), and Methotrexate (an antifolate used to treat rheumatoid arthritis, among other conditions). (R. 497.) Rowland was also taking a compound opioid analgesic. Dr. Shroff's July 21 treatment notes indicate that Rowland was still on Percocet (oxycodone and acetaminophen), but Dr. Mohler indicated on July 5 that Rowland had switched to Lortab by this time. (R. 497, 796.) Rowland stated that Enbrel (etanercept, a biopharmaceutical used to treat rheumatoid arthritis and other autoimmune diseases), which Dr. Shroff prescribed at his last visit, had not yet been approved by his insurance company. (R. 495.) Dr. Shroff gave Rowland an injection of 160 mg Depo Medrol (methylprednisone acetate, a corticosteroid) in his right deltoid and referred him to Dr. Winikur for pain management. (R. 498.) He also held Rowland out of work for a month until Rowland's next visit. (R. 482, 498.)

On August 18, Rowland followed up with Dr. Shroff. (R. 483–87.) Rowland reported having a lot of pain symptoms since his last visit. (R. 483.) Findings on physical exam were unchanged since the last visit. (R. 486.) Dr. Shroff asked Rowland to follow up with pain management and held Rowland out of work until his next appointment in three months. (R. 486.)

Rowland visited Dr. Murray Joiner on September 9, 2010. (R. 462–66.) Dr. Joiner noted that Rowland was using a walker, but that Rowland admitted that this was one of the only times that he used it. (R. 462, 465.) Rowland complained of "constant, waxing and waning, diffuse myalgias and arthralgias, which he describe[d] as 'head to toe.'" (R. 462.) He told Dr. Joiner that it took him until 10:00 a.m. to get up in the morning, and that he does okay until 1:00 to 2:00 p.m., when the pain starts increasing. (R. 462.) Rowland described the pain as "aching and

throbbing" and that it increased with cold weather and walking on concrete and decreased with Lortab taken three to four times per day. (R. 463.) Rowland also reported that, at the time, he was caring for his father who was suffering from prostate cancer. (R. 464.)

Physical examination revealed bony hypertrophy of the tibial tuberosity in Rowland's right knee, but no tenderness, erythema, edema, or increased temperature. (R. 465.) Dr. Joiner noted no signs of erythema, edema, increased temperature, or tenderness in any other joints. (R. 465.) Spinal exam was normal, except for "inconsistent discomfort on palpitation of bilateral [sacroiliac] joints." (R. 465.) Under "Impression," Dr. Joiner indicated "diffuse arthralgias secondary to rheumatoid arthritis by history," "history of fibromyalgia," and "multiple medical problems complicating course." (R. 466.) Dr. Joiner recommended that Rowland obtain a functional capacity evaluation and referred him to physical therapist Timothy Smith. (R. 466–68.)

Rowland saw Timothy Smith for a functional capacity evaluation on October 5, 2010. (R. 467–75.) Rowland reported that he experienced pain throughout his body, which worsened with physical activity and was eased by medication. (R. 470.) Rowland indicated that on a scale of 1 to 10 his pain varied from 7 to 10 over the past 30 days and was a 9 before the evaluation. (R. 474.) Rowland scored high on 12 out of 13 pain questionnaires, which Smith suggested "represent[s] a trend toward pain and disability which are out of proportion to the impairment." (R. 467, 474.) Smith also conducted grip strength, static, and dynamic testing. (R. 471–72.) Based on these tests, he concluded that Rowland was capable of medium work. (R. 468.) Smith also noted that Rowland scored unequivocal or high on only 1 out of 9 tests for validity, indicating that Rowland gave maximal effort during the tests. (R. 467.)

Rowland first visited Dr. Winikur at Piedmont Pain Clinic on October 12, 2010. (R. 889–92.) Rowland complained of widespread joint and body pain, which he described as "sharp, dull, aching, burning, throbbing, and cramping, with tingling, numbing and weakness." (R. 889.) Rowland said that medication made his pain "tolerable," but doing "anything" made it worse. (R. 889.) On examination, Dr. Winikur noted abnormal flexion and abnormal and painful extension of the back and bilateral shoulder and knee tenderness. (R. 892.) Dr. Winikur diagnosed rheumatoid arthritis, fibromyalgia syndrome, and chronic pain syndrome. (R. 892.) He had Rowland initiate a trial of 50 microgram Duragesic (fentanyl) patches every 72 hours, but otherwise maintained Rowland's existing medications. (R. 892.)

Rowland returned to Dr. Shroff on October 19, 2010. (R. 678–82.) Rowland indicated that he was dealing with a lot of stress because of his father's recent death and told Dr. Shroff that he felt like he needed to go back on diazepam "for his nerves." (R. 678.) Findings on physical examination were substantially unchanged from Rowland's last visit with Dr. Shroff. (R. 681.) Dr. Shroff gave Rowland some diazepam tablets and held him out of work for another two months until his next visit. (R. 481, 682.) He noted that he wanted Rowland to continue on Enbrel for three to six months "before we decide that it is not working." (R. 682.)

Rowland saw Dr. Robert Elliott at Staunton River on December 1, 2010. Dr. Elliott indicated that he "had seen Rowland down at the BGF Clinic and had given him a few Lortab until … he could get back to see Dr. [Shroff] apparently down in Danville. Apparently his dad died and he got messed up" (R. 793.) Dr. Elliot noted complaints of joint aches and pain. (R. 793.) Rowland asked Dr. Elliott to refill his Lortab, but Dr. Elliott refused. (R. 793.) Physical examination was normal except for multiple positive trigger points. (R. 793.) Dr. Elliott gave Rowland a shot of Depo Medrol and stated that "[w]e are going to start him on some Doxepin 25

mg for chronic pain and get a note off to Dr. [Shroff] and Dr. [Winikur] for his management."

(R. 793.)

At Rowland's December 20 follow-up visit with Dr. Shroff, he again complained of pain all over his body. (R. 873.) On physical examination, Rowland demonstrated strongly positive Bunnel's test, negative Tinel's and Phalen's tests, crepitus in his knees, swelling in his knees and ankles, and strongly positive tender points all over his body. (R. 875.) Under "treatment plan," Dr. Shroff wrote:

> I would like patient to get a functional assessment through physical therapy for his disability application at this point in time along with his job function sheet, which he will take to physical therapy for an object[ive] function assessment. Clinically, given the nature of his joint symptoms, and the swelling and pain, I do not believe that he will be able to function at work at this point in time. I will keep him out of work for another 2 months until he follows back up with me. In the interim, he will be following up with pain management, Dr. Winikur, to see if there may be any other option from a pain management stand point for him.

(R. 875.)

Rowland followed up with Dr. Winikur on December 21. (R. 893–96.) Rowland complained of "widespread body pain" which he described as "sharp, dull, aching, burning, throbbing, cramping, shooting and stabbing with tingling, numbness and weakness at times." (R. 893.) Rowland rated the severity of his pain as 7 out of 10, and reported that his pain increased with activity and decreased with rest. (*Id.*). Rowland reported that he tried to use the fentanyl patch after his last visit, but had to stop because of nausea and vomiting. (*Id.*). Rowland reported that Lortab was ineffective for his pain. (R. 893–94.) Dr. Winikur noted that Rowland had never tried Percocet, oxycodone, methadone, or Opana. (R. 893.) Dr. Winikur increased the dose of Lortab and instructed Rowland to return in two months. (R. 893, 96.)

On February 4, 2011, Dr. Shroff penned a note stating that Rowland "will be out of work through his next appointment [on] March 1, 2011. (R. 871.)

Rowland returned to Dr. Winikur for another follow-up visit on February 16, 2011. (R. 897–900.) Dr. Winikur indicated that Rowland's conditions had worsened since his last visit. (R. 897.) Rowland complained of "entire body and joint pain," which he rated as 8 out of 10 and characterized as "a combination of sharp, stabbing, aching, and throbbing with tingling and numbness in his lower legs and feet." (R. 897.)[1] Rowland reported that the modified Lortab prescription was "only mildly effective, and at times does not help at all." (R. 897.) He also stated that cold weather, and prolonged sitting, standing, and laying down aggravated his pain. (R. 897.) In the treatment notes for this visit, under "Plan," Dr. Winikur wrote, "It is my opinion that he is totally disabled from Rheumatoid Arthritis and Fibromyalgia. I am releasing him back to his PCP and his Rheumatologist." (R. 899.) Dr. Winikur instructed Rowland to follow up in two months. (R. 899.)

Dr. Shroff saw Rowland again on March 1. (R. 867–70.) At this visit, Rowland reported that "pain management has been helping to some extent and has taken the edge off his pain and joint issues." (R. 868.) Findings on physical examination were unchanged. (R. 870.) Dr. Shroff noted that "[k]eeping him out of work … the last two months … has helped him to some extent," and added that he felt Rowland "would benefit by staying out of the [sic] work for the next two months" so that "we can get his arthritis under better control." (R. 868.) Dr. Shroff also wrote a note "to whom it may concern" stating that Rowland would be out of work until May 4, 2011. (R. 866.)

Rowland followed up again with Dr. Winikur on March 16, 2011. (R. 901–04.) Again, Rowland reported muscle and joint pain throughout his body, which was the worst in his knees and shoulders. (R. 901.) Rowland described the pain, which he rated as 7 out of 10, as "sharp

_____

[1] Rowland also complained of chest pain, which two days earlier led him to visit to the emergency room; doctors there found no cardiac findings. (R. 897.)

[and] stabbing" and stated that cold, damp weather increases his pain. (R. 901.) Rowland also complained of intermittent spasms and cramps in his lower back and upper abdomen, which were not relieved by Soma (an OTC muscle relaxant). (R. 901.) Rowland indicated that his Lortab regimen was moderately effective, but caused him restlessness and stomach upset. (R. 901.) Dr. Winikur concluded that Rowland was sensitive to the acetaminophen in Lortab, and therefore decided to switch Rowland from Lortab to oxycodone. (R. 904.) Dr. Winikur wrote a prescription for 15 mg four times per day and instructed Rowland to start by taking half a tablet every four hours as needed. (R. 904.) He instructed Rowland to follow up in two months. (R. 904.)

Rowland followed up with Dr. Winikur on May 12. (R. 928–30.) At this visit, Rowland complained of generalized joint and body pain, which he rated 6 out of 10 and described as "a sharp, stabbing sensation." (R. 928.) Rowland also complained of periodic spasms, and indicated that Soma caused a rapid heartbeat. (R. 928.) Rowland indicated that the oxycodone regimen was moderately effective in relieving his pain. (R. 928.) He reported that activity made his pain worse and that rest relieved it. (R. 928.)

On May 16, Rowland saw Dr. Shroff again. (R. 951.) Rowland indicated that since his last visit he "ha[d] been taking the medications including prednisone with some improvement in his rheumatoid arthritis symptoms." (R. 951.) Findings on physical examination were unchanged, and Dr. Shroff prescribed 10 mg Prednisone taken once daily. (R. 951.) Dr. Shroff maintained all medications and gave Rowland an injection of 80 mg Depo Medrol. (R. 951.)

At his June 21 visit to Dr. Winikur, Rowland again complained of pain throughout his body, which he described as "a constant dull ache with intermittent cramping and spasms in his lower back and legs." (R. 924.) Rowland rated his pain 7 out of 10 and indicated that it was most

severe in his left wrist and throughout his back. (R. 924.) He reported that oxycodone made his pain tolerable. (R. 924.) Rowland also stated that "standing for long periods, lifting, and overactivity increase the pain." (R. 924.) Dr. Winikur wrote Rowland a prescription for a two month supply of oxycodone and instructed him to return in August. (R. 926–27.)

Rowland followed up with Dr. Shroff on July 29, 2011. (R. 948–50.) Dr. Shroff indicated in treatment notes that Rowland was "doing well with no flare-ups at this time." (R. 948.) Physical examinations were normal except for some swelling in Rowland's fingers. (R. 948–50.) Dr. Shroff prescribed Pennsaid (an NSAID) for Rowland's knee.

On August 16, 2011, Rowland again saw Dr. Winikur. (R. 921–23.) Rowland presented "with complaints of pain throughout all muscles and joints," which he rated as a 7 out of 10 but described as "tolerable" with oxycodone. (R. 921.) Rowland told Dr. Winikur that pain in his right lower lumbar area and right flank area worsened two weeks earlier after he had to crawl under a machine at work. (R. 921.) He indicated that "weight bearing activity and duties that apply pressure to his back and all joints increase his pain." (R. 921.) Dr. Winikur prescribed 10 mg of Flexeril three times per day for muscle spasms as well as another two-month supply of oxycodone. (R. 923.) Dr. Winikur indicated that Rowland's status had worsened since his last visit. (R. 921.)

Rowland returned to the pain clinic on October 12, 2011. (R. 988–92.) Dr. Winikur indicated that Rowland's status had again worsened. (R. 988.) Rowland complained of increased pain in the lower lumber and mid thoracic regions, which worsened after he slipped and fell while shopping the day before. (R. 988.) After he fell, Rowland visited the emergency department, where he was given a morphine injection. (R. 988.) X-rays revealed no abnormal findings, and Rowland was diagnosed with muscle strains in his back. (R. 988.) Rowland

indicated that any movement made his pain worse, and that his pain was "mild to moderately controlled" with oxycodone. (R. 988.) Rowland rated his pain an 8 out of 10. (R. 988.) Dr. Winikur maintained all of Rowland's prescriptions and instructed him to return in two months. (R. 991.)

Chiropractor Adam Palmer saw Rowland on four occasions in November 2011, after Rowland slipped and fell in a store. (R. 970–85.) Palmer reported that, on each successive visit, Rowland indicated his pain improved slightly. (*Id.*).

Rowland testified at the administrative hearing that he worked as a finishing operator at a BGF Industries textile plant from 1988 through July 2010. (R. 47–48.) He stated that he stopped working because "[m]y back went out and that fibromyalgia got all over me." (R. 48.) Rowland testified that his pain "got to where I couldn't stand[] on that concrete and climb[] up and down the steps and clean[] rollers and all of that stuff." (R. 48–49.) During this period, Rowland received short-term and long-term disability. (R. 50–51.) When this disability assistance and his health insurance ran out, Rowland decided to try returning to work. (R. 52.)

Rowland testified that in May 2011, Dr. Shroff cleared him to return to work. (R. 48, 50.) Rowland was able to continue working for about three months, but had to stop on August 3, 2011, after he injured his back while crawling under a machine to clean. (R. 47, 52.) Although he was initially "all right," he experienced muscle spasms the following morning and had to call in sick. (R. 52.) Since then, he has not returned to work. Rowland testified that, during his three-month return to work, other workers would help him with the more arduous tasks. (R. 52–53.)

When asked about his symptoms, Rowland testified that he suffered pain from arthritis in "just about all my joints" and from fibromyalgia "in my arms and legs and muscles and stuff." (R. 53.) Rowland testified that he suffers pain all the time and that medication "just dulls" it.

(R. 53–54.) He indicated that his pain "stays about a constant seven" on a scale from one to ten with medication. (R. 54.) Rowland stated that medication made him drowsy and tired and caused him to forget what he was doing at times. (R. 55.) Rowland also noted that his pain interfered with his sleep. (R. 55–56.)

Rowland also offered testimony about the effect his pain had on his physical abilities. He indicated that standing or sitting for too long worsens his pain and that he has to lie down often. (R. 55.) He estimated that he could stand for thirty minutes to an hour. (R. 55.) He testified that he could not lift as much as he used to and that if he got down on the floor to crawl he would have to grab a hold of something to get up. (R. 53.)

When asked about his daily activities, Rowland testified that in 2010 he could do little more than "sit around and watch TV and … go down to the store every once in a while and get something to eat." (R. 58.) In 2011, before he returned to work, he would "maybe wash a few dishes and clothes." (R. 58.) Rowland added that he has not done "much" since his return to work, because he "was exerted from working" and "messed up" his back. (R. 58.) Rowland did admit that he "may wash a few dishes sometimes." (R. 58–59.) Rowland testified that, in a typical day, he would get up to eat breakfast, sit around for an hour while his medication took effect, shower and brush his teeth, watch a little more television, go to the store to get something to eat, return home and watch some more television, eat dinner (prepared by his wife), and "sit there and watch TV until it's bedtime." (R. 60.)

In response to questions by the ALJ, Rowland testified that he drove to work daily to get food, and usually drove for two to three hours on a normal day. (R. 47.) Later, upon questioning by counsel, Rowland indicated that he drove this much three days a week when he had medical

appointments and on other days would drive only two and a half miles each way to the store.

(R. 59–60.)

In his written decision, the ALJ addressed Dr. Winikur's opinion, as stated in his February 2011 treatment notes, that Rowland was totally disabled because of rheumatoid arthritis and fibromyalgia. (R. 32.) In rejecting this opinion, the ALJ explained:

> [T]his opinion does not appear to have adequately considered the full medical record. For example, the claimant has continuously reported to doctors that his prescribed medication makes his pain tolerable, and he was able to work for a 3-month span after he saw Dr. Winikur, during which he stated that he was doing well with no-flare ups. Therefore, because the opinion of this treating physician does not consider the claimant's later work history or response to medication, it is afforded no weight.

(R. 32.)

The ALJ also noted Dr. Shroff's instructions that Rowland stay out of work from July 2010 through May 2011. (R. 32.) The ALJ offered the following discussion of Dr. Shroff's statements:

> [E]ach of these recommendations were for short periods of time totaling less than 12 months straight, and directly after the last recommendation that the claimant stop working for 2 months, the claimant began again to work for his old employer, according to his testimony. Also, from the medical record of evidence, it appears that medication helped the claimant tolerate his pain, and he continued to have full strength and good reflexes during his visits with Dr. Shroff. Therefore, because the undersigned has determined that this opinion does not fully incorporate all of the claimant's progress and overestimates the severity of his symptoms, it is afforded no weight.

(R. 32.)

2.    *Analysis*

An ALJ must consider and evaluate all opinions from "medically acceptable sources," such as doctors, in the case record. 20 C.F.R. § 404.1527. In determining what weight to afford a doctor's opinion, the ALJ must consider all relevant factors, including the relationship between the doctor and the patient, the degree to which the opinion is supported or contradicted by other

evidence in the record, and whether the doctor's opinion pertains to his area of specialty. 20 C.F.R. § 404.1527(c).

Opinions from physicians who have treated the patient are generally afforded more weight, because treating sources are "most able to provide a detailed longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence." 20 C.F.R. § 404.1527(c)(2); *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006). An ALJ must give a treating source opinion "controlling weight" to the extent that the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and … not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. § 404.1527. Even when a treating source opinion is less than "well-supported" by diagnostic techniques, it is still entitled to a measure of deference. *Tucker v. Astrue*, 897 F. Supp. 2d 448, 465 (S.D.W. Va. 2012) (citing Social Security Ruling 96-2p). However, an ALJ may reject a treating physician's opinion in whole or in part if there is "persuasive contrary evidence" in the record. *Hines*, 453 F.3d at 563 n. 2; *Mastro*, 270 F.3d at 178; *Tucker*, 897 F. Supp. 2d at 465. The ALJ may give "significantly less weight" to a treating physician's "conclusory opinion based on the applicant's subjective reports." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). The ALJ also may discount a treating physician's conclusory opinion when it is inconsistent with the applicant's daily activities. *Dennison v. Astrue*, 5:10-cv-109, 2011 WL 2604847, at *2 (W.D. Va. Jul. 1, 2011) (citing *Craig*, 76 F.3d at 590). When an ALJ gives less than controlling weight to a treating physician's opinion, the treating source rule requires him to specify how much weight he gives the opinion and offer "good reasons" for that decision. 20 C.F.R. § 404.1527(c)(2).

Dr. Winiker's opinion that Rowland is permanently disabled is not a "medical opinion." Opinions on issues "reserved to the Commissioner," such as whether a person is disabled, are not considered "medical opinions" entitled to any special weight under the regulations. 20 C.F.R. § 404.1527(d)(1); Social Security Ruling ("SSR") 96-5p, 1996 WL 374183; *Huff v. Astrue*, No. 6:09cv42, 2010 WL 5296842, at *5 (W.D. Va. Nov. 22, 2010). "Medical opinions are statements from … acceptable medical sources that reflect judgments about the nature and severity of [the applicant's] impairment(s)," including: (1) the applicant's symptoms, diagnosis, and prognosis; (2) what the applicant can still do despite his or her impairment(s); and (3) the applicant's physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2). At the same time, statements from treating physicians on issues reserved to the commissioner are relevant and often important evidence. The ALJ must evaluate these statements in light of the whole record to determine the extent to which the opinion is supported by the record, considering the same factors used to evaluate "medical opinions." SSR 96-5p, at *3; *see also* 20 C.F.R. § 404.1527(c).

The ALJ rejected Dr. Winikur's February 2011 opinion that Rowland was disabled because that opinion "does not appear to have adequately considered the whole medical record." (R. 32.) Specifically, the ALJ noted that Dr. Winikur's opinion failed to consider Rowland's later work history, and Rowland's response to medication. (R. 32.) Rowland takes issue with both of these reasons.

First, Rowland argues that his brief return to work was not a good reason for the ALJ to discredit Dr. Winikur's opinion, especially in light of the fact that Rowland had to stop working because of his medical conditions. (Pl. Br. 3–4.) Rowland also argues, based on Dr. Winikur's January 2012 letter, that the ALJ's statement that "[Rowland's] prescribed medication makes his pain tolerable" was inaccurate. (Pl. Br. 4.)

Rowland's three-month return to work in the summer of 2011 was an "unsuccessful work attempt"—an attempt to return to work after the onset of disability that later proves unsuccessful. 20 C.F.R. § 404.1574(c). An ALJ may not consider an unsuccessful work attempt in determining whether a claimant has engaged in substantial gainful activity. 20 C.F.R. § 404.1574(a).

However, an ALJ may consider an unsuccessful work attempt in assessing a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."); SSR 96-8p, 1996 WL 374184, at *5 (stating that RFC assessment must be based on all relevant evidence, including "[e]vidence from attempts to work"); *Blair v. Astrue*, 5:10-cv-00112, 2012 WL 625001, at *4 (W.D. Va. Feb. 24, 2012) (holding that an ALJ may consider an unsuccessful work attempt in assessing a claimant's credibility regarding the severity of her symptoms, and collecting cases). An unsuccessful work attempt may offer insight into what a claimant can do as well as what a claimant cannot do. Accordingly, courts have reversed ALJ decisions that failed to adequately consider unsuccessful work attempts in assessing a claimant's RFC, *see, e.g.*, *Kilinski ex rel. Kilinki v. Astrue*, 430 Fed. Appx. 732, 738 (10th Cir. 2011); *Reider v. Apfel*, 115 F. Supp. 2d 496, 505 (M.D. Pa. 2000), and they have affirmed ALJ decisions citing unsuccessful work attempts as evidence of a claimant's ability to work, *see, e.g.*, *Barraza v. Barnhart*, 61 Fed. Appx. 917 (5th Cir. 2003); *Blair*, 2012 WL 625001, at *4; *Thomas v. Astrue*, No. 1:11-cv-72-MP-GRJ, 2012 WL 1815623, at *8 (N.D. Fla. April 2, 2012), *report and recommendation adopted*, 2012 WL 1813536 (May 18, 2012).

The ALJ in this case fully accounted for Rowland's unsuccessful work attempt in evaluating his residual functional capacity. In many respects, his consideration of the work attempt was favorable to Rowland. Consistent with Rowland's unsuccessful work attempt, the

ALJ found that Rowland lacked the physical capacity to return to his job at the textile plant, which according to the VE involved medium work. (R. 25, 32, 66.) At the hearing, the ALJ asked Rowland why he cut short his work attempt in August 2011. Rowland explained that, after crawling under a machine at the factory one day to sweep for trash and debris, he experienced severe back spasms the following morning. (R. 49–50.) The ALJ mentioned this event in his RFC assessment and accordingly limited Rowland to only occasional "stooping, kneeling, crouching, and crawling." (R. 25, 26, 29.) Additionally, the ALJ limited Rowland to jobs that involved light work. (R. 25.)

The ALJ also properly considered Rowland's failed work attempt as evidence of what Rowland could do, despite his impairments. The ALJ reasoned that Rowland's medical records from May through August 2011 suggested that he was coping reasonably well with the demands of work. In June 2011, Rowland told Dr. Winikur that, while his pain was "tolerable" with medication, "standing for long periods, lifting, and overactivity increase [his] pain." (R. 924.)[2] Dr. Shroff indicated in his treatment notes the following month that Rowland was "doing well, with no flare ups at this time." (R. 948.) Based on these reports and on Rowland's ability to maintain work for roughly three months before aggravating his back injury, the ALJ reasonably concluded that Rowland could maintain a full-time job at a slightly lower exertional level. Thus, the ALJ properly found that Rowland's failed work attempt showed some ability to work, even if

---

[2] The ALJ quoted Dr. Winikur's notes from the June 2011 visit as stating that Rowland had in fact been "standing for long periods, lifting, and being overactive," and that this increased his pain. (R. 31.) Rowland argues that this misstates the record, as the treatment notes state only that "standing for long periods, lifting, and being overactive increase [his] pain," and not that he actually was "standing for long periods, lifting, and being overactive." (Pl. Br. at 5.) Rowland stresses that nothing in the record indicates that he told Dr. Winikur that he was actually required to stand for long periods of time at work. (Pl. Br. at 5–6.) But, Rowland never actually denies that his job required him to stand, lift heavy objects, or overexert himself, and the record demonstrates that his job required standing up to 6 hours in an 8 hour day, lifting up to 50 pounds occasionally and 25 pounds frequently, and maintaining a level of activity above what the ALJ deemed Rowland capable of doing. (R. 83.) Rowland's explanation does not provide grounds for the Court to interfere with the ALJ's findings of fact.

not at his former job, and was inconsistent with Dr. Winikur's opinion that Rowland was totally disabled.

The ALJ also appropriately considered Rowland's reports to his physicians that medication made his pain "tolerable" to discount Dr. Winikur's opinion. When Dr. Winikur stated that Rowland was "totally disabled," Rowland was taking Lortab for his pain. Dr. Winikur's treatment notes indicate that this medication was not providing Rowland with consistent or adequate relief. (R. 893, 897, 901.) At Rowland's March 2011 visit, Dr. Winikur decided to replace Rowland's Lortab prescription with oxycodone. (R. 904.) As the ALJ noted, Rowland's oxycodone prescription appeared to "significantly control and alleviate his symptoms." (R. 30.) In May, Rowland reported that his medications were "moderately effective" in relieving his pain and provided him "some improvement" in rheumatoid arthritis symptoms. (R. 928, 951.) In June, he told Dr. Winikur that the pain was "tolerable" with medication. (R. 924.) In July, Rowland told Dr. Shroff that he was "doing well with no flare ups at this time." (R. 948.) In August, after Rowland left work, he told Dr. Winikur that his oxycodone regimen "decreased [his pain] to tolerable levels." (R. 993.) And, in October 2011, Dr. Winikur noted that, while Rowland's pain "remains at elevated levels," it "is mild to moderately controlled with regimen of Oxycodone 15 mg QID." (R. 988.)

Based on a review of the medical records, the ALJ determined that Rowland's pain was controlled by medications. If a symptom, including pain, "can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). To the extent that the record contains conflicting evidence, it is the ALJ's job, not the Court's, to weigh the evidence and draw inferences. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

When viewed in light of Rowland's three-month return to his job and his own reports about the relief from pain he obtained from medications, Dr. Winikur's opinion that Rowland was totally disabled was not consistent with the record. *See* 20 C.F.R. 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Moreover, his opinion was on an issue reserved to the Commissioner, and it was not entitled to any special weight under the regulations. 20 C.F.R. § 404.1527(d)(1). Thus, the ALJ acted well within his discretion as a factfinder in this case in affording no weight to Dr. Winikur's opinion.

Rowland also argues that the ALJ improperly discounted the medical judgments reflected in Dr. Shroff's instructions that Rowland stay out of work at two month increments for a total of ten months from July 2010 through May 2011. The ALJ rejected Dr. Shroff's opinions because they did not "fully incorporate" Rowland's progress as evidenced by his return to work. Additionally, the ALJ found that Dr. Shroff's opinion overstated the severity of Rowland's symptoms because treatment records demonstrated that Rowland's pain was tolerable with medications and he had good strength and reflexes upon examination.

Dr. Shroff's instructions holding Rowland out of work are not "medical opinions" under the Commissioner's regulations. 20 C.F.R. § 404.1527(d). From Dr. Shroff's statements, one can safely infer that he believed that Rowland was unable to meet the demands of his job, which involved medium work, from July 2010 through May 2011.[3] That conclusion, of course, is entirely consistent with the ALJ's opinion limiting Rowland to light work. Thus, it is not clear

---

[3] Dr. Shroff did expressly state, in treatment notes from December 2010, that "given the nature of [Rowland's] joint symptoms, and the swelling and pain, I do not believe that he will be able to function at work at this point in time." (R. 875.) The ALJ noted this statement in his decision, although he did not expressly mention it when he discussed the weight he afforded Dr. Shroff's opinions. (R. 28, 32.)

that Dr. Shroff's opinion is inconsistent with the ALJ's residual functional capacity assessment, and if there is no inconsistency, there is no reversible error.

Apparently, the ALJ inferred that Dr. Shroff believed Rowland incapable of *any* work, not just Rowland's particular job. Assuming that the ALJ reasonably inferred that Dr. Shroff believed Rowland was totally disabled, the ALJ offered good reason for disagreeing. While keeping Rowland out of work for two month intervals, Dr. Shroff (and Dr. Winikur) tried different treatments and medications to see if Rowland's condition improved. When Dr. Shroff evaluated Rowland in July 2011 after he had returned to work, Dr. Shroff noted that Rowland was doing well, and his physical examination was normal. Rowland's three-month return to work, along with his reports to his doctors that medication made his pain tolerable, provide ample support for the ALJ's rejection of Dr. Shroff's opinion, at least to the extent that the ALJ believed Dr. Shroff had opined that Rowland was permanently disabled. Therefore, whether Dr. Shroff's opinion was the Rowland was temporarily unable to perform his job or could not perform any work, the ALJ did not commit reversible error in his treatment of that opinion.

*B.   New Evidence*

After the ALJ issued his decision, Rowland submitted a letter from Dr. Winikur restating his opinion that Rowland is disabled. (R. 998–99.) In this letter, Dr. Winikur further explains that

> Mr. Rowland has two conditions that impair him greatly, the first being Rheumatoid Arthritis which accounts for at least 75% of his impairment. Due to the medications that he must use to control his symptoms, opioids, clonazepam, lyrica, methotrexate[,] Etanercept, he is severely hindered by their side-effects. His second condition, Fibromyalgia Syndrome causes him to have impaired sleep, and functioning which in turn affect his daytime functioning. Due to the additional pain of his soft tissues this further compounds his impairment. It is my professional opinion that Mr. Rowland is permanently and totally disabled. I do not expect him to improve in the future and in fact expect his condition to deteriorate.

(R. 998–99.) In the letter, Dr. Winikur also addressed the two reasons the ALJ gave for rejecting his earlier opinion. In particular, Dr. Winikur stated that the medications "only provided [Rowland] with minimal relief," and that "[i]n spite of [his] conditions, Mr. Rowland attempted to return to work May 2011 until August 2011, but the pain symptoms and loss of joint range of motion caused him to have to return to not working." (R. 998.)

When, after an unfavorable ALJ decision, a claimant offers new and material evidence to the Appeals Council, the Appeals Council must consider that evidence if it "relates to the period on or before the date of the [ALJ] hearing decision." 20 C.F.R. § 404.970(b); *Wilkins v. Sec'y of Health and Human Servs.*, 953 F.2d 93, 95 (4th Cir. 1991) (en banc). "Evidence is 'new' if it is not duplicative or cumulative, and is material 'if there is a reasonable possibility that the new evidence would have changed the outcome.'" *Davis v. Barnhart*, 392 F. Supp. 2d 747, 750 (W.D. Va. 2005) (quoting *Wilkins*, 953 F.2d at 95–96).

Even if it is confronted with new and material evidence that relates to the relevant period, the Appeals Council will grant review based on the new evidence only when "it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently in the record," including the newly-submitted evidence. 20 C.F.R. § 404.970(b). The Appeals Council is not required to give reasons for denying review or to explain how it considered any additional evidence a claimant has submitted. *Davis*, 392 F. Supp. 2d at 751 (citing *Freeman v. Halter*, 15 Fed. Appx. 87, 89 (4th Cir. 2001)). However, the reviewing court must consider the record as a whole, and not just the evidence before the ALJ, to determine whether substantial evidence supports the Commissioner's decision. *Wilkins*, 953 F.2d at 96; *Ridings v. Apfel*, 76 F. Supp. 2d 707, 709 (W.D. Va. 1999).

Here, the Appeals Council "considered" this letter but determined, without further explanation, that it "does not provide a basis for changing the [ALJ]'s decision." (R. 1–2.) Such summary rejection of additional evidence makes review difficult, because the Court must examine the ALJ's decision in light of evidence that the ALJ never considered. *Ridings*, 76 F. Supp. 2d at 709; *Riley v. Apfel*, 88 F. Supp. 2d 572, 579–80 (W.D. Va. 2000) ("When this court is left in the dark as to how the Appeals Council treated the new evidence a meaningful judicial review is impossible."). The Court may not attempt to weigh the new evidence or to resolve conflicts with existing evidence. *Dunn v. Colvin*, __ F. Supp. 2d __, __, 2013 WL 5295675, at *9 (W.D. Va. Sept. 19, 2013) (citing *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996)). Instead, it must determine whether the evidence was "material"—in other words, whether the evidence had "a reasonable possibility of changing the outcome of the case." *Id.* (citing *Riley*, 88 F. Supp. 2d at 579–80). If the new evidence "is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports," *id.*, then it is conceivable that the ALJ would have reached a different result upon considering it, and the court must reverse.[4]

Although Dr. Winikur wrote the letter a month after the ALJ issued his decision, the opinions he expresses in the letter clearly relate to the relevant period. Notably, the Appeals Council considered the letter instead of returning it to Rowland on the grounds that it did not relate to the relevant period, as it did with other records post-dating the ALJ's decision that Rowland submitted along with the letter. (R. 2.)

However, little in Dr. Winikur's letter appears either new or material. Dr. Winikur had already stated his opinion that Rowland was disabled in February 2011 treatment notes, which

---

[4] Failure to discuss new, material, and time-period relevant evidence can never be harmless error, because, by definition, evidence is material only if its non-consideration causes prejudice to the applicant. *Cf. Kersey v. Astrue*, 614 F. Supp. 2d 679, 696 (W.D. Va. 2009) ("Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error.").

the ALJ rejected based on its inconsistency with Rowland's attempt to return to work and statements in treatment records regarding the relief he obtained from medication. And, while the letter does elaborate on the basis for Dr. Winikur's opinion by listing Rowland's conditions, symptoms, and medications, the record already contained ample evidence of all of these facts. Moreover, Dr. Winikur's observation that Rowland aborted his work attempt due to pain and loss of joint range of motion is duplicative of Rowland's own testimony. *Cf. Filus v. Astrue*, No. 1:11-cv-00106, 2011 WL 6826394, at *12 (N.D. Ind. Dec. 28, 2011) (finding that letter from treating doctor "merely respond[ing] to the ALJ's discussion of [the doctor's] diagnosis of failed back syndrome, repeat[ing] his earlier 2004 and 2007 diagnostic findings, and then opin[ing] on the ultimate issue of disability" was cumulative and thus not new); *DiBlasi v. Commissioner*, 660 F. Supp. 2d 401, 406–07 (N.D.N.Y. 2009) (finding that letter from physician stating that claimant "is an isolated individual who cannot function in the workplace" was "merely cumulative of that already in the record").

However, at least one statement in Dr. Winikur's letter is new: Dr. Winikur's statement that Rowland is "severely hindered" by the side-effects of his medications. (R. 998.) This statement is consistent with Rowland's statements both in his own testimony and in materials he submitted to the agency. (R. 55, 200, 204, 214, 238.) Dr. Winikur's own treatment notes on the point are, at best, internally inconsistent; he repeatedly indicated "None" after "Adverse Effects," (R. 894, 897, 924, 928, 931, 988, 993.) while also finding that Rowland was alert and "oriented x3", yet "lethargic" and "som[n]olent," (R. 892, 895, 899, 926, 930, 933, 990, 995.)

Medical records contain a handful of other references to possible side effects. In two separate visits in July 2010, Dr. Mohler observed that Rowland appeared "sedated," and noted on one occasion that this may be due to Rowland's Lortab prescription. (R. 794, 795–96.) In August

2010, Allison Brooks, a Nurse Practicioner at CentraHealth Cardiovascular Group in Lynchburg, noted that Rowland "appear[ed] drowsy." (R. 413.) Cardiologist Fadi El Ahdab made the same notation in an August 2011 treatment note. (R. 940.)

An assessment of a claimant's residual functional capacity "must be based on *all* of the relevant evidence in the case record," including "the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., … side effects)." SSR 96-8P, 1996 WL 374184, at *5 (emphasis in original). Moreover, an ALJ must consider medication side effects in evaluating the credibility of a claimant's statements about subjective symptoms like pain. 20 C.F.R. § 404.1529(c)(3)(iv). However, an ALJ's failure to consider medication side effects prejudices the claimant only if the claimant has provided evidence that the side effects caused some limitation in the claimant's RFC. *Cf. Lowery v. Commissioner*, No. 4:10cv00047, 2011 WL 2648470, at *4 (W.D. Va. June 29, 2011) ("Plaintiff has failed to show that his … medication side effects create limitations which should have been included in the Law Judge's RFC finding."). As the Fourth Circuit noted in *Johnson v. Barnhart*, "'[d]rowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations.'" 434 F.3d 650, 658 (4th Cir. 2005) (quoting *Burns v. Barnhart*, 312 F.3d 113, 131 (3d Cir. 2002)).

Here, the ALJ noted that Rowland testified that his pain medication "leaves him drowsy, tired, and with memory loss issues." (R. 25.) Some of the medical records include notes that Rowland appeared drowsy. None, however, suggest that any side effects from his medications, such as his drowsiness, caused impairment. Moreover, Rowland never identified how his drowsiness affected his ability to function, and the record does not support any functional limitations based on drowsiness. The ALJ found that Rowland's "statements concerning the

intensity, persistence and limiting effects" of his symptoms were "not credible to the extent they are inconsistent with [the ALJ's] residual functional capacity assessment," (R. 30) a finding that "encompassed [Rowland's] testimony about his [medication] side effects." *Walker v. Comissioner*, 404 Fed. Appx. 362, 367 (11th Cir. 2010). Accordingly, the ALJ included no limitations in his RFC based on drowsiness or other medication side-effects. Dr. Winiker's letter does not erode the ALJ's RFC assessment.

Although Dr. Winikur's statement in the letter regarding side effects conflicts with the ALJ's findings, it is not material because it does not raise a reasonable possibility of a different result on remand. Dr. Winikur's conclusory statement that Rowland is "severely hindered by" the side effects of his medication fails even to specify what side effects hinder Rowland, much less identify how those side effects limit Rowland's ability to work. *See Thompson v. Colvin*, Civ. No. 1:12-01551, 2013 WL 4742776, at *20 (S.D.W. Va. Sept. 3, 2013) (finding that ALJ committed no error in evaluating medication side effects where treating doctors indicated that medication limited claimant's ability to work, but failed to identify specific side effects or limitations). Moreover, Dr. Winikur's "conclusory opinion[] … must be discounted to the extent that [it is] based on the same subjective complaints of [side effects] that the ALJ had found, after proper analysis, to be in part not credible." *Bauer v. Shalala*, 53 F.3d 917, 919 (8th Cir. 1995). Finally, Dr. Winikur's opinion is inconsistent with his own treatment notes, which repeatedly indicate that Rowland experienced no adverse effects from his pain medications. *See Tolliver v. Astrue*, No. CV-10-422-JPH, 2012 WL 1574805, at *8 (E.D. Wash. May 3, 2012) (suggesting that "it is difficult to see how" a treating doctor's letter that is "inconsistent with" her treatment notes "would have changed the outcome"). Just as a litigant in an ordinary civil case cannot avoid summary judgment by pointing to a contradiction between his own expert's affidavit and

the same expert's earlier deposition testimony, *Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970, 975 (4th Cir. 1990), a claimant in a social security disability case cannot gain a remand by pointing to a contradiction between a doctor's own treatment notes and a letter from the same doctor rebutting an ALJ's decision that had properly considered those notes. *See Evans v. Astrue*, No. 5:11-cv-78, 2011 WL 5193464, at *17–18 (N.D.W. Va. Oct. 14, 2011) ("Dr. Siavashi's letter is not material because it is inconsistent with his own office notes and with other substantial evidence supporting the ALJ's decision.").

Thus, because Dr. Winikur's January 2012 letter is not "material" evidence, remand for further consideration of the letter is not warranted in this case.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the Commissioner's motion for summary judgment be **granted**, Rowland's motion for summary judgment be **denied**, and the Commissioner's decision be **affirmed**.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: May 8, 2014

Joel C. Hoppe
United States Magistrate Judge